IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 31, 2007

## TENN-FLA PARTNERS v. HENRY C. SHELTON, III, ET AL.

**Appeal from the Circuit Court for Shelby County**
**No. CT-000908-01     John McCarroll, Jr., Judge**

_____

**No. M2006-00945-COA-R3-CV - Filed on February 26, 2007**

_____

Client appeals the dismissal of its legal malpractice action against the attorneys who represented it in a bankruptcy proceeding. The trial court determined that the action was barred by the Statute of Limitations and that there were no grounds upon which the trier of fact could find that the loss alleged by the client was caused by any negligent act or omission of the defendants. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which PATRICIA J. COTTRELL and FRANK G. CLEMENT, JR., JJ., joined.

Bruce Kramer, Scott A. Kramer, Memphis, Tennessee, for the appellant, Tenn-Fla Partners.

Jeff Feibelman, Mary Hale, Memphis, Tennessee, for the appellees, Henry C. Shelton, III; C. Bradford Foster, III; Evans & Petree, A Partnership.

**OPINION**

**I.**

Tenn-Fla Partners is a Tennessee general partnership that in 1989 owned as its sole asset a 360 unit apartment complex near Orlando Florida. The apartment complex was financed by $12,685,000 in tax exempt bonds secured by the property and held by First Union National Bank of Florida ("First Union"). In 1992, Tenn-Fla decided to file a Chapter 11 Bankruptcy petition and retained Henry C. Shelton, III, and C. Bradford Foster, III, of the law firm Evans & Petree to represent it in the bankruptcy proceedings. Tenn-Fla filed its petition in the United States Bankruptcy Court for the Western District of Tennessee on July 17, 1992.

Tenn-Fla remained in possession of the apartment complex during the bankruptcy proceeding and proposed a plan of reorganization which would allow Tenn-Fla to repurchase the property and

bonds for $9,100,000 which was the amount determined by the Bankruptcy Court to be the value of the property. Prior to the confirmation hearing, however, Tenn-Fla, through its management company, had contact with several entities interested in purchasing the property at prices expected to be substantially above $9,100,000. Tenn-Fla did not inform the Bankruptcy Court or First Union of the interest in the property, but rather postponed any offers until after the confirmation hearing by telling the prospective purchasers that the property could not be marketed while it was in bankruptcy. On January 21, 1994, the Bankruptcy Court confirmed the plan of reorganization allowing Tenn-Fla to repurchase the apartment complex and bonds for $9,885,000. Less than two weeks later, Tenn-Fla entered into a contract to sell the complex and bonds to United Dominion Realty Trust, Inc., for $12,443,547.

On March 3, 1994, after learning of Tenn-Fla's contract to sell the property for a substantial gain, First Union filed an adversarial proceeding in the Bankruptcy Court seeking to revoke the order confirming the plan of reorganization pursuant to 11 U.S.C. §1144.[1] The Bankruptcy Court conducted a trial on the merits and, on August 4, 1994, revoked the order confirming the plan of reorganization. The Bankruptcy Court specifically found that Tenn-Fla had provided misleading and incomplete disclosures, had deliberately stalled prospective purchasers from making offers on the property, and had concealed information so that it could repurchase the property at a discount, knowing the property could be immediately sold at a substantial profit. The Bankruptcy Court's decision was ultimately affirmed by both the United States District Court for the Western District of Tennessee and the Sixth Circuit Court of Appeals.

After the dispute with First Union arose, Tenn-Fla retained another attorney, Frank Glankler. On September 28, 1994, Mr. Glankler met with Mr. Shelton and Mr. Foster to discuss Tenn-Fla's potential malpractice claim and the effect of that claim on the pending appeal of the bankruptcy court's August 4, 1994 order. Mr. Glankler proposed that Mr. Shelton and Mr. Foster continue to represent Tenn-Fla in the Bankruptcy appeal and that a tolling agreement be entered to toll the one-year statute of limitations for the potential malpractice claim. Drafts of a tolling agreement were exchanged over the next few months. These initial drafts contained an effective date of November 30, 1994. However, a dispute arose concerning the payment of the legal fees owed to Evans & Petree by Tenn-Fla and, as of July 1995, no tolling agreement had been signed. On August 3, 1995, the parties finally executed a tolling agreement which provided that any suit commenced within sixty days after termination of the bankruptcy appeal would be deemed to have been filed on August 3,

_____

[1]11 U.S.C. §1144 provides:

On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud. An order under this section revoking an order of confirmation shall–

(1) contain such provisions as are necessary to protect any entity acquiring rights in good faith reliance on the order of confirmation; and

(2) revoke the discharge of the debtor.

1995. The agreement states "any suit filed prior to the termination date shall not be subject to the defense of any statute of limitation or similar statutory defense, unless such defense was valid, enforceable and not subject to waiver or estoppel prior to August 3, 1995." The agreement also acknowledges Tenn-Fla's disputed contention that the defendants had agreed to toll the statute of limitations effective November 30, 1994.

The Sixth Circuit Court of Appeals affirmed the revocation of the plan of reorganization on September 18, 2000. On February 15, 2001, Tenn-Fla filed its complaint for legal malpractice asserting that the defendants were negligent in failing to advise Tenn-Fla of its disclosure obligations and fiduciary duties as a debtor in possession in a bankruptcy proceeding and of the 180-day period in which an order confirming a plan of reorganization can be set aside for fraud pursuant to 11 U.S.C. §1144. The defendants ultimately filed a motion for summary judgment asserting, in part, that Tenn-Fla's claims are barred by the statute of limitations and that no act or omission on the part of the defendants caused the plaintiff's alleged loss. The trial court granted the motion for summary judgment on both grounds, and Tenn-Fla filed a timely notice of appeal.[2]

## II.

Summary judgments enjoy no presumption of correctness on appeal. *City of Tullahoma v. Bedford County*, 938 S.W.2d 408, 412 (Tenn.1997); *McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 894 (Tenn.1996). Accordingly, we must make a fresh determination concerning whether the requirements of Tennessee Rule of Civil Procedure 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn.1997). Summary judgment is appropriate only when there are no genuine factual disputes with regard to the claim or defense embodied in the motion and when the moving party is entitled to a judgment as a matter of law. Tenn.R.Civ.P. 56.04; *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn.1997); *Carvell v. Bottoms*, 900 S.W.2d 23, 26 (Tenn.1995). A party may obtain a summary judgment either by affirmatively negating an essential element of the nonmoving party's claim or by conclusively establishing an affirmative defense that defeats the nonmoving party's claim. *Byrd v. Hall*, 847 S.W.2d 208, 215 n. 5 (Tenn.1993). In reviewing a summary judgment, we must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in favor of the nonmoving party. *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn.1997); *Mike v. Po Group, Inc.*, 937 S.W.2d 790, 792 (Tenn.1996).

Summary judgment is proper in virtually all civil cases that can be resolved on the basis of legal issues alone, *Byrd v. Hall*, 847 S.W.2d at 210; *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn.Ct.App.2001) Defenses based on a statute of limitations are particularly amenable to summary judgment motions. *Creed v. Valentine*, 967 S.W.2d 325, 327 (Tenn.Ct.App.1997); *Allied Sound, Inc. v. Neely*, 909 S.W.2d 815, 820 (Tenn.Ct.App.1995). Most often the facts material to a statute of limitations defense are not in dispute. When the facts and the inferences reasonably drawn from the facts are not disputed, the court can bring to bear the applicable legal principles to determine whether the moving party is entitled to a judgment as a matter of law.

---

[2]The appeal was transferred to the Middle Section of the Court of Appeals on December 7, 2006.

**III.**

The trial court first ruled that Tenn-Fla's claim is barred by the Statute of Limitations. Legal malpractice actions must be commenced within one year after the cause of action accrues. Tenn. Code Ann. § 28-3-104(a)(2). As a general rule, a cause of action for an injury accrues when the injury occurs. In legal malpractice actions, the one-year statute of limitations starts to run when the client suffers a legally cognizable injury resulting from an attorney's negligence, and the client knows or should know the facts sufficient to give notice of that injury. *John Kohl & Co., P.C. v. Dearborn & Ewing*, 977 S.W.2d 528, 532 (Tenn.1998); C*arvell v. Bottoms*, 900 S.W.2d at 29. In this case, Tenn-Fla knew or should have known that it had suffered a "legally cognizable injury" no latter than March 3, 1994, the date it was served with First Union's complaint to revoke the order confirming the plan of reorganization. Accordingly, the statute of limitations ran on March 3, 1995.

**The Tolling Agreement**

Parties may enter into a "tolling agreement" whereby the defendant agrees not to plead the statute of limitations. Such agreements are governed by contract law, and their interpretation requires the court to ascertain the intent of the parties. If the contract is plain and unambiguous, the meaning thereof is a question of law, and it is the Court's function to interpret the contract as written according to its plain terms. *Petty v. Sloan*, 197 Tenn. 630, 277 S.W.2d 355 (1955). If the language of a written instrument is unambiguous, the Court must interpret it as written rather than according to the unexpressed intention of one of the parties. *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526 (Tenn.App.1981).

Pursuant to the August 4, 1995 tolling agreement, Tenn-Fla's February 15, 2001 complaint is deemed to have been filed on August 3, 1995, five months after the statute of limitations ran. Moreover, the tolling agreement specifically provides that it is not applicable to any defense of statute of limitation which would have been effective as a defense prior to August 3, 1995. The statute of limitations defense would have been effective as a defense on March 3, 1995. Accordingly, the August 4, 1995 tolling agreement does not preclude the defendants from asserting the statute of limitations defense.

Tenn-Fla also asserts that, before the August 4, 1995 tolling agreement was signed, the defendants had agreed to toll the statute of limitations effective November 30, 1994. The August 4, 1995 agreement even recognizes their assertion. However, the undisputed facts do not support the existence of such an agreement. While draft agreements containing the November 30, 1994 date were exchanged in the course of the parties' negotiations, the parties did not enter into any valid and enforceable tolling agreement prior to August 4, 1995.

**Continuous Representation**

Tenn-Fla contends that under the "continuing representation" theory, the statute of limitations was tolled during the entire time the defendants continued to represent Tenn-Fla in the bankruptcy appeal. In *Cherry v. Williams*, 36 S.W.3d 78 (Tenn. Ct. App. 2000), this Court determined that the continuing representation rule is inconsistent with the discovery rule. In doing so, we relied on the

Tennessee Supreme Court's decision that the analogous "continuing treatment" theory in medical malpractice cases has been subsumed into the discovery rule. *Stanbury v. Bacardi*, 953 S.W.2d 671, 676 (Tenn.1997). Accordingly we held that "a litigant who learns that it has suffered a cognizable legal injury and that this injury was caused by the negligence of its lawyer but who nevertheless continues to be represented by that lawyer will be forever barred from bringing suit against the lawyer unless it files suit within one year after the discovery of the injury and its cause." *Cherry v. Williams*, 36 S.W.3d at 87. We find no reason to depart from our holding in *Cherry*. Tenn-Fla's action, deemed filed on August 3, 1995, is thus barred by the one-year statute of limitations.

## IV.

As an additional ground for granting summary judgment, the trial court held that the undisputed facts fail to establish any grounds upon which the trier of fact could find the loss alleged by Tenn-Fla was caused by any negligent act or omission of the defendants. In order to prove legal malpractice, a plaintiff must establish that (1) the defendant attorney owed a duty to plaintiff; (2) the attorney breached that duty; (3) the plaintiff suffered damages; and (4) the breach proximately caused the plaintiff's damage. *Horton v. Hughes*, 971 S.W.2d 957, 959 (Tenn.Ct.App.1998). Tenn-Fla directs the majority of its argument to the first and second elements, the duty owed by the defendants and their alleged breach of that duty. Tenn-Fla asserts that "because the issue of whether the conduct of the defendants meets a particular standard of conduct is not a question of law for the court, the trial court's granting of summary judgment was in error." We agree that a factual dispute exists regarding whether the defendants breached a duty to Tenn-Fla. The trial court, however, based its decision on Tenn-Fla's failure to establish proximate cause rather than its failure to establish a breach of duty.

A defendant's negligence is the proximate cause of a loss if the negligence was a substantial factor in causing the injury, the injury could have reasonably been foreseen by an ordinary person, and there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm. *Love v. American Fed'n of State, County and Mun. Employees Local 1733*, 165 S.W.3d 623(Tenn. Ct. App. 2004). Even assuming, as we must for the purposes of summary judgment, that Tenn-Fla's allegations regarding the standard of care and the defendants' breach are true, Tenn-Fla cannot establish that the defendants' breach was a substantial factor in causing any alleged loss. In the absence of the defendants' alleged negligence, Tenn-Fla would have had to disclose the prospective purchasers' interest in the property, the bankruptcy court would not have approved Tenn-Fla's proposed plan of reorganization, and Tenn-Fla would not have been allowed to repurchase the property and bonds for $9,885,000. Tenn-Fla has not been damaged by having the order approving the plan of reorganization revoked when, absent the alleged negligence, the plan would not have been approved in the first place. In other words, Tenn-Fla was prevented from purchasing the property for $9,885,000 and thus reaping a windfall, not because of the defendants' alleged negligence, but because the property was actually worth more than $9,885,000 on the open market. This "loss" would have occurred with or without the defendants' alleged negligence.

The proximate cause issue in this case cannot be properly understood without an understanding of the exhaustive background predating this case as reported in *First Union National Bank of Fl. v. Tenn-Fla Partners (In re Tenn-Fla Partners)*, 170 B. R. 946 (Bankr.W.D.Tenn.1994), *aff'd in part, re'd in part sub nom*, 229 B.R. 720 (W.D.Tenn.1999)*, aff'd*, 226 F.3d 746 (6th Cir.2000).

Tenn-Fla owned a single asset, an apartment complex in Orlando, Florida, having acquired the property in 1984 for a purchase price of $5,019,960.48 in cash and the assumption of $12,700,000 in debt. In February 1989, the debtor reorganized and in November of that year refinanced the first mortgage on the property through tax-exempt bond financing issued by Florida Housing Finance Agency. First Union National Bank of Florida became the trustee for the holders of the publicly traded bonds, which were in the amount of $12,685,000. A general economic downturn occurred in the Orlando, Florida real estate and apartment market, and the general partners of Tenn-Fla personally borrowed $2,500,000 from First Tennessee Bank in Memphis for contributions to the operational expenses of Tenn-Fla.

On July 11, 1992, Tenn-Fla filed a Chapter 11 bankruptcy proceeding in the U.S. Bankruptcy Court for the Western District of Tennessee at a time when Tenn-Fla had authorized Mr. Harry Ray Coleman, Jr. to act on behalf of the partnership, including such things as signing the bankruptcy petition together with disclosure statements and bankruptcy plans. Prior to confirmation, the bankruptcy court, after a contested valuation hearing, determined the value of the property to be $9,100,000. At the confirmation hearing on January 14, 1994, Tenn-Fla, as debtor in possession, agreed to pay $9,885,000 to purchase the bonds and effectively repurchase the property. *In Re Tenn-Fla Partners*, 170 B.R. 946, 949-50 (Bankr. W.D.Tenn.1994).

"Under the confirmed plan, TFP agreed to pay $9,885,000 (about $350,000 of which would go to First Union as part of an administrative claim) for the property and the bonds. This resulted in an approximate 75-percent recovery to the bond holders, with the shortfall being discharged." *Tenn-Fla Partners v. First Union Nat'l Bank of Florida*, 229 B.R. 720, 725 (W.D.Tenn.1999).

So it is that under the confirmed plan of January 14, 1994, first mortgage bondholders secured in the amount of $12,685,000 accepted the plan whereby the debtor in possession could purchase the bonds and the property for $9,500,000 after paying $350,000 to First Union as an administrative claim with First Union agreeing to "write off" some $3,170,000 of its first mortgage principle.

Nineteen days after the confirmation hearing, Tenn-Fla contracted to sell the bonds and the property to United Dominion for $12,443,547 resulting in a net recovery to Tenn-Fla of approximately $2,500,000 over the amounts necessary for payment to the bondholders and creditors under the confirmed plan.

Upon discovery of the sale to United Dominion:

First Union subsequently filed suit to revoke the bankruptcy court's order of confirmation so that First Union might recover the excess proceeds for the bondholders. First Union claimed TFP knew of the property's true value and under-represented that value at the confirmation proceeding so that any excess proceeds from the sale of the property would benefit TFP's equity holders.

The bankruptcy court allowed TFP to proceed with the sale of the bonds and property to United Dominion and to make certain distributions required under the plan, but required TFP to place the excess in escrow pending a determination of First Union's claim.

*Tenn-Fla Partners*, 229 B.R. at 725.

Trial under First Union's complaint resulted in extensive findings of fraud on the part of Tenn-Fla as the proof showed that prior to the confirmation hearing, Tenn-Fla had negotiated with United Dominion along with other potential purchasers for amounts far in excess of the $9,100,000 value placed upon the property by the bankruptcy court and far in excess of the $9,885,000 paid by the debtor in possession for the purchase of the bonds and the property. *In Re Tenn-Fla Partners*, 170 B.R. 946 (Bankr.W.D.Tenn.1994).

This holding of the bankruptcy court was affirmed by the United States District Court for the western district of Tennessee (229 B.R.720) and by the United States Court of Appeals for the Sixth Circuit, 226 F.3d 746 (6th Cir.2000).

The bankruptcy court held that Tenn-Fla had perpetrated a fraud upon the court.

The debtor misrepresented to the court at the confirmation hearing that it proposed its plan in good faith and that the debtor was in compliance with the Code's disclosure requirements. This is best seen in the light of the debtor's plan had a consensual confirmation not resulted. The bondholders had exercised their § 1111(b)(2) election right; thus, § 1129(a)(7)(B) normally would have controlled a consensual plan. However, one effect of the debtor's willful nondisclosure was to deceive the bondholders into accepting the debtor's plan and waiving their § 1111(b)(2) election. The debtor's representatives were fully aware of the effect of that § 1111(b)(2) election. Clearly, had those secured creditors been advised of the true value of the property they would not have consented to sell to the debtor for so much less than their full claim. The bondholders would have retained their full secured claim. As First Union has argued, with full disclosure of the debtor's knowledge of the market, First Union probably would have withdrawn its plan, sought to negotiate a sale to JMB, Colonial or United Dominion, or sought conversion or dismissal in order to foreclose and sell after bankruptcy. First Union had escape clauses in its contracts with Apollo and Hall, allowing termination if to do so would be in the best interest of the bondholders. However, the court is not

required to decide what the bondholders would have done; rather, the court knows that it would have not confirmed the debtor's plan had the court known that the debtor knew of an immediate $2,300,000 equity return to insiders of the debtor. In the context of this case, with an § 1111(b)(2) election and the withdrawal of that election under the inducement of the debtor, the need for full and honest disclosure is underscored.

*In Re Tenn-Fla Partners*, 170 B.R. at 969.

It is against this background that Tenn-Fla now seeks to visit upon its attorneys representing it before the bankruptcy court an assertion of malpractice. Crippling to such an assertion and fatal to Tenn-Fla's assertion of proximate causation are certain undisputed facts.

1.   The agent of Tenn-Fla who was responsible for all the bankruptcy filings and who conducted the negotiations with United Dominion and others testified that he was advised by counsel "to disclose everything to everyone at all times."

2.   The defendant Shelton testified by deposition without contradiction that based upon the information that was provided to him by representatives of Tenn-Fla he believed that a full disclosure of all offers had been made to the court prior to confirmation and that he learned only as a result of the adversary proceeding that certain information regarding possible offers to buy the property for substantial amounts had not been disclosed to him. Indeed, had the facts disclosed otherwise, defendant lawyers would have faced the kind of drastic professional and ethical sanctions reserved for attorneys who fail to conform their conduct to the duties required of officers of the court. *Nix v. Whiteside*, 106 S.Ct. 988, 475 U.S. 157, 89 L.Ed. 123 (1986); *People v. DePallo*, 754 N.E.2d 751 (N.Y.2001); *In Re Hensley*, 249 B.R. 318 (Bankr.W.D.Okla.2000); *In Re Luarks*, 301 B.R. 352 (Bankr.Kan.2003).

3.   Tenn-Fla suffered no loss as a result of any action by the defendant attorneys. The sale to United Dominion was not set aside as a result of the court action by First Union, but was instead confirmed. As a result, the approximately $2,500,000 windfall, which otherwise would have gone to Tenn-Fla Partners to pay their personal debt of $2,500,000 to First Tennessee Bank in Memphis, goes to the trustee for the bondholders, who are lawfully entitled to it in the first place.

Tenn-Fla asserts that, were it not for the defendants' negligence, it would not have sold the property but would have continued to operate it. Again, had Tenn-Fla disclosed the existence of the potential purchasers and the true value of the property, the plan of reorganization would not have been approved and Tenn-Fla would not have been able to repurchase the property for $9,885,000. Even if Tenn-Fla had been able to retain possession of the property, any potential profit from continuing to operate it is speculative at best and not recoverable. *Overstreet v. Shoney's, Inc.*, 4

S.W.3d 694, 703 (Tenn.Ct.App.1999). Finally, we find untenable any argument that, had Tenn-Fla been informed of its disclosure obligations and fiduciary duties and of the 180 day period for setting aside the confirmation order, Tenn-Fla could have avoided a loss by not selling the property within the 180 day period and keeping the potential purchasers and the true value of the property secret. It is not the alleged lack of knowledge of the 180-day provision of 11 USC section 1144 but the fraud of failure to disclose prior to the confirmation hearing of January 21, 1994, that soils the hands of Tenn-Fla.

The bankruptcy court, as trier of fact, in many respects exonerated Dr. Meyer of the fraud practiced upon the bankruptcy court. Tenn-Fla, however, may not divide itself into component parts and disavow the actions of the agent it placed completely in charge of the property negotiations as to the property and disclosures to the bankruptcy court when that agent testifies that he was advised by counsel "to disclose everything to everyone at all times." The Uniform Partnership Act applicable in Tennessee from 1917 in 2001 provided:

> (c) The law of agency shall apply under this chapter.

Tenn.Code Ann. § 61-1-103.

The Revised Uniform Partnership Act applicable following the enactment of chapter 353 of the Public Acts of 2001 provides in pertinent part:

> (a) Unless displaced by particular provisions of this chapter, the principles of law and equity supplement this chapter.

Tenn.Code Ann. § 61-1-104.

The defendants have affirmatively negated the essential proximate cause element of Tenn-Fla's claim. The undisputed facts clearly show that Tenn-Fla would not be able to establish that it has suffered any damages proximately caused by the defendants' alleged negligence. The defendants are thus entitled to a judgment as a matter of law.

## V.

The judgment of the trial court is affirmed in all respects, and the case is remanded to the trial court for such further proceedings as may be necessary. Costs are taxed to Tenn-Fla Partners and its surety, for which execution may issue.

_____
WILLIAM B. CAIN, JUDGE